UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

STEVEN TRAPP,

          Plaintiff,                    Case No. 2:23-cv-37

v.                                           Honorable Paul L. Maloney

ERICA HUSS et al.,

          Defendants.
_____/

**OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff was previously granted leave to proceed *in forma pauperis*. (ECF No. 4.) Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Huss, Viitala, Pelky, and Tasson. With the exception of Plaintiff's Eighth Amendment claim against Defendant Hoult regarding COVID-19-positive kitchen porters, all of Plaintiff's other Eighth Amendment claims against Defendant Hoult will be dismissed for failure to state a claim. Plaintiff's Eighth Amendment claim

against Defendant Hoult regarding COVID-19-positive kitchen porters and Plaintiff's state law claim against Defendant Hoult will remain in the case.

## Discussion

### I. Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Baraga Correctional Facility (AMF) in Baraga, Baraga County, Michigan. The events about which he complains, however, occurred at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. Plaintiff sues the following MBP officials: Warden Erica Huss; Resident Unit Manager D. Viitala; Deputy Warden Douglas Tasson; and Assistant Deputy Wardens K. Pelky and Unknown Hoult. (Compl., ECF No. 1, PageID.1.)

In Plaintiff's complaint, he alleges that in January of 2022, "another wave of COVID-19 struck the facility at MBP."[1] (*Id.*, PageID.2.) Plaintiff contends that this "wave of COVID-19" occurred due to "Administrative Staff's[2] failure to routinely test [MBP] custody staff members, such as [correctional officer] Kent (non-party) who carried the virus back into the facility." (*Id.*)

After multiple officers at MBP tested positive for COVID-19, "medical staff at MBP [conducted] mass COVID testing on the prison population in the second week of January, which revealed that numerous prisoners in B Unit, where the Plaintiff was housed, had contracted the

---

[1] In this opinion, the Court corrects the spelling, punctuation, and capitalization in quotations from Plaintiff's complaint.

[2] Plaintiff states that all of the named Defendants "are collectively identified as 'Administrative Staff'" in the complaint. (Compl., ECF No. 1, PageID.1.) The Court notes that "[s]ummary reference to a single, five-headed 'Defendants' [or staff] does not support a reasonable inference that each Defendant is liable . . . ." *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (citation omitted) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008))).

deadly virus due to close contact with positive staff." (*Id.*) Plaintiff states that "[d]uring the course of prisoners testing positive for COVID-19 in the unit, 'Administrative Staff' allowed for the COVID-positive inmates to remain housed in the unit with those who were still negative at that time, such as the Plaintiff," which subjected "the negative prisoners to contract the deadly virus without taking protective measures to circumvent the mass spreading of the virus in accordance with MDOC protocol." (*Id.*)

"Plaintiff was housed in B Unit on the first tier, cell #2 (B-1-2) where he had multiple encounters with 'Administrative Staff' and raised his concerns of having to lock with COVID-positive prisoners subjecting him to easily contract the virus from neighboring, positive inmates." (*Id.*) Specifically, Plaintiff alleges that on January 12, 2022, he "had an opportunity to speak directly with Defendants Mr. Pelky and Mr. Viitala concerning the issues of staff's failure to separate and quarantine the COVID-positive prisoners in the unit in accordance with MDOC protocol." (*Id.*) Plaintiff asked Defendant Viitala "as to whether or not he had the authority to quarantine or separate COVID-positive prisoners," and "Defendant Viitala stated that the Administrative Staff w[ould] be doing no such thing as far as quarantining is concerned, and it would be best if we all just contract the virus and get it over with." (*Id.*, PageID.2–3.) "Plaintiff then contended with Mr. Viitala that his notion on how to deal with the outbreak of the virus was egregious and violated MDOC COVID protocols." (*Id.*, PageID.3.) In response, Defendant Viitala stated: "MDOC protocols concerning COVID are no longer in effect and don't apply here." (*Id.*)

Plaintiff states that he also spoke with Defendant Pelky when Pelky "made a round in the unit," and Plaintiff "raised his concerns of Pelky's failure to exercise his authority to separate and quarantine the COVID-positive prisoners in the unit." (*Id.*) "Defendant Pelky stated that the virus was 'not that serious' as it was last year and that the MDOC protocol no longer applied as it . . . is

3

'outdated.'" (*Id.*) "Plaintiff contended with Mr. Pelky's opinion, . . . arguing that people were still dying from the virus and that his (the Plaintiff's) health was very serious." (*Id.*) In response, Defendant Pelky stated: "Well . . . it's unfortunate Mr. Trapp, but there's nothing I can do for you guys here." (*Id.* (ellipses in original).)

The following day, January 13, 2022, Plaintiff also "had an opportunity to speak directly with Defendant Mr. Tasson when he made a round in the unit concerning staff's failure to quarantine the COVID-positive prisoners." (*Id.*) "Defendant Tasson proclaimed that MBP was no longer obligated to quarantine the COVID-positive prisoners and that the virus was 'not that serious.'" (*Id.*) "Plaintiff contended with Mr. Tasson arguing that his decision to continue housing COVID-positive inmates with those who were negative contributed to the mass spreading of the virus and violated the MDOC's COVID protocols." (*Id.*) In response, "Mr. Tasson contested the Plaintiff's position," stating: "Tell me something that I don't know, Mr. Trapp. You'll be alright." (*Id.*)

Subsequently, "on or about January 15, 2022," Plaintiff "addressed the issue of staff's failure to separate and quarantine the COVID-positive prisoners, who were now working as kitchen porters in the unit passing out trays to the entire population in the unit with [Defendant] Hoult." (*Id.*, PageID.4.) Plaintiff asked Defendant Hoult "why MBP staff continued to allow COVID-positive prisoners to remain housed with those, such as the Plaintiff, who were still negative of the virus." (*Id.*) In response, Defendant Hoult stated "that the issue was not that serious and that no one here at MBP ha[d] died from COVID-19." (*Id.*) "Plaintiff contended that the MDOC COVID protocols still mandated for COVID-positive prisoners to be quarantined to help circumvent the spread of the virus." (*Id.*) Defendant Hoult stated that "MBP is only concerned

4

with moving past the outbreak status and cannot focus on preventing everyone from contracting the virus, which is 'inevitable.'" (*Id.*)

Thereafter, on January 18, 2022, Plaintiff spoke with Defendant Huss "concerning the issue of having to live amongst the COVID-positive prisoners while he was still negative." (*Id.*) Defendant Huss advised Plaintiff that:

> the MDOC COVID protocols no longer applied at MBP, that B Unit (where Plaintiff was housed) [wa]s a COVID cohort unit even though it housed both negative and positive inmates, that MBP does not quarantine COVID-positive prisoners, that the virus [wa]s not that serious this time, and that it was the prisoner population's fault (not staff's) that the virus was spreading throughout the facility.

(*Id.* (emphasis omitted).) Plaintiff states that on January 19, 2022, he tested positive for COVID-19 after medical staff conducted testing using "the 'rapid' COVID nasal swab tester on the population." (*Id.*)

Based on the foregoing allegations, Plaintiff avers that Defendants violated his rights under the Eighth Amendment, as well as under state law. As relief, Plaintiff seeks a declaratory judgment, and compensatory, punitive, and nominal damages. (*Id.*, PageID.5–6.)

## II. Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

A. **Eighth Amendment Claims**

Plaintiff alleges that Defendants violated his Eighth Amendment rights because he was incarcerated under conditions that put him at risk of contracting COVID-19. (*See* Compl., ECF No. 1, PageID.5.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Eighth Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam)

(quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, the prisoner must show that he faced a sufficiently serious risk to his health or safety and that Defendants acted with "'deliberate indifference' to inmate health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

        **1.**     **Objective Prong**

As noted above, in this action, Plaintiff contends that he was incarcerated under conditions that put him at risk of contracting COVID-19. (*See generally* Compl., ECF No. 1.) In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the United States Court of Appeals for the

Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had satisfied the objective component of an Eighth Amendment claim, stating that:

> The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. . . . The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

Here, Plaintiff alleges conditions that could have facilitated COVID-19 transmission within his prison (*see generally* Compl., ECF No. 1); however, Plaintiff has not alleged any facts to suggest that he suffers from a condition that makes him medically vulnerable. Nevertheless, at this early stage of the proceedings, the Court assumes, without deciding, that Plaintiff has alleged facts sufficient to satisfy the objective prong of the deliberate indifference test.

### 2. Subjective Component

With respect to the subjective component, in *Wilson*, the Sixth Circuit also addressed the subjective component of an Eighth Amendment COVID-19-related claim, noting that the pertinent question was whether the prison's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison. *See Wilson*, 961 F.3d at 840–41.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19

8

and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision in *Wilson*, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of*

9

*Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Wilson*, 961 F.3d at 843–44.

More recently, the Sixth Circuit affirmed this Court's dismissal of a claim with some similarities to Plaintiff's, stating:

> The subjective prong . . . generally requires alleging at least that the defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. (quoting *Farmer*, 511 U.S. at 842). "The official must have a subjective 'state of mind more blameworthy than negligence,' akin to criminal recklessness." *Cameron v. Bouchard*, 815 F. App'x 978, 984 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 835). As relevant here, "[t]he key inquiry is whether the [defendants] 'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (quoting *Farmer*, 511 U.S. at 844) (alterations added and omitted). And a response may be reasonable even if "the harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted.'" *Id*. at 841 (quoting *Farmer*, 511 U.S. at 844).
>
> Dykes-Bey fails to satisfy the subjective prong. He alleges that the defendants, knowing of the harm posed by COVID-19, acted with deliberate indifference by not providing KCF's inmates with the necessary means to practice social distancing. But Dykes-Bey's complaint does not allege any facts indicating that the defendants were deliberately indifferent to him or any other plaintiff. The complaint does not allege, for example, that KCF had enough physical space to implement social distancing, and that the defendants deliberately chose not to use that space. *Cf. Cameron*, 815 F. App'x at 986 (concluding that the plaintiffs failed to produce evidence showing that the defendants let empty prison cells go unused). . . .
>
> Moreover, Dykes-Bey's focus on social distancing ignores the "key inquiry" in these cases—whether the defendants "'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (citation omitted). To that end, Dykes-Bey's own allegations establish that the defendants acted reasonably. The complaint recognizes, for example, that the defendants screened employees daily for COVID-19 symptoms, provided masks to inmates, required correctional officers to wear masks (although some unnamed officers allegedly did not wear them properly), and provided bleach-based disinfectant in every communal bathroom. In other words, Dykes-Bey's complaint acknowledges that the defendants took affirmative steps to mitigate COVID-19's risks. Although he

10

> argues that those steps would ultimately be insufficient to stop an outbreak, whether these steps were sufficient matters less than what they say about the defendants' states of mind. *Id*. at 841 (noting that defendants may have responded reasonably even if the "harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted'" (quoting *Farmer*, 551 U.S. at 844)). That is, what matters is whether the precautionary steps taken show that the defendants responded reasonably to the risks of COVID-19. Here, as in *Wilson*, they do. *See, e.g.*, *id.* at 840–41 (finding that similar measures amounted to a reasonable response). In short, these allegations defeat the subjective prong and thus his deliberate indifference claim.
>
> The district court concluded that the defendants were not deliberately indifferent, but it relied on materials outside the record—official sanitation and hygiene policies adopted by the MDOC, reports of confirmed COVID-19 cases at KCF, and an MDOC press release—to reach this conclusion. *See* R. 36, Page ID# 281. Even if its consideration of those materials was improper, we may affirm on any basis supported by the record. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). As stated, Dykes-Bey's own allegations suffice to show that the defendants did not disregard the risks of COVID-19. Therefore, we affirm the district court's judgment on those grounds.

*Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *2–3 (6th Cir. Oct. 14, 2021) (footnote omitted).

### a. COVID-19-Positive Kitchen Porters—Defendant Hoult

With respect to Defendant Hoult, Plaintiff alleges that "on or about January 15, 2022," Plaintiff "addressed the issue of staff's failure to separate and quarantine the COVID-positive prisoners, who were now working as kitchen porters in the unit passing out trays to the entire population in the unit with [Defendant] Hoult." (Compl., ECF No. 1, PageID.4.) Plaintiff does not provide any further explanation about this allegation; however, at this stage of the proceedings, taking Plaintiff's factual allegations as true and in the light most favorable to him, the Court will not dismiss this claim against Defendant Hoult on initial review.

### b. Remaining Claims—Defendants Huss, Viitala, Pelky, Hoult, and Tasson

Reading Plaintiff's complaint with all due liberality, *see Haines*, 404 U.S. at 520, he first contends that all of the named Defendants failed to prevent an outbreak of COVID-19 in January

11

of 2022 at MBP due to a "failure to routinely test [MBP] custody staff members, such as [correctional officer] Kent (non-party) who carried the virus back into the facility." (Compl., ECF No. 1, PageID.2.) As an initial matter, Plaintiff fails to allege any *facts* to suggest that his assertion regarding the cause of the outbreak is anything other than conjecture on his part. Specifically, Plaintiff does not allege any facts suggesting that he had any knowledge, either firsthand, secondhand, or even thirdhand, of how correctional officers were, or were not, screened upon entering MBP. Likewise, although Plaintiff alleges that "mass COVID testing . . . revealed that numerous prisoners in B Unit, where the Plaintiff was housed, had contracted the deadly virus *due to close contact with positive staff*," Plaintiff alleges no facts to plausibly suggest that the inmates in his unit contracted COVID-19 from MBP staff (as opposed to from other inmates), let alone from staff members who had not been tested for COVID-19 but who would have otherwise returned a positive test. (*Id.* (emphasis added)); *cf. Sanders v. Macauley*, No. 22-1502, 2022 WL 16729580, at *3 (6th Cir. Aug. 10, 2022) (concluding that Plaintiff's allegations "related to the failure to test [correctional] staff [we]re vague," and stating that "[t]esting of every staff member before every encounter with prisoners would be infeasible"), *cert. denied*, 143 S. Ct. 410 (2022).

With respect to the actions that Defendants took in response to the outbreak at MBP, Plaintiff's own allegations describe steps that Defendants took in response to the outbreak. For example, based on Plaintiff's allegations, Defendants clearly provided COVID-19 testing for prisoners. (Compl., ECF No. 1, PageID.2 (stating that "medical staff at MBP [conducted] mass COVID testing on the prison population").) Although this testing occurred, Plaintiff alleges in a conclusory manner that after the testing revealed that "numerous prisoners in B Unit, where the Plaintiff was housed," were positive for COVID-19, "the COVID-positive inmates . . . remain[ed] housed in the unit with those who were still negative at that time, such as the Plaintiff," which

12

subjected "the negative prisoners to contract the deadly virus without taking protective measures to circumvent the mass spreading of the virus in accordance with MDOC protocol." (*Id.*) However, as explained below, the factual allegations in Plaintiff's complaint are simply too scarce to show deliberate indifference.

Specifically, Plaintiff does not allege where the COVID-19-positive prisoners were housed on the unit. Plaintiff vaguely contends that there were "neighboring, positive inmates" (*id.*), but he provides no further explanation or facts about his specific proximity to the COVID-19-positive prisoners. Plaintiff also does not indicate whether he was vaccinated or whether he had previously had COVID-19. Further, Plaintiff does not allege that he lacked a mask or other personal protective equipment, or that he was unable to practice social distancing from other prisoners. Additionally, Plaintiff does not indicate what his status was following the first round of testing. Plaintiff states that he was "still negative at that time" (*id.*); however, he does not indicate whether he was considered to have had "close contact" with COVID-19-positive inmates. In light of the lack of facts alleged about the specific circumstances of Plaintiff's confinement, the mere fact that Plaintiff told Defendants that COVID-19-positive prisoners were housed somewhere on his unit and asked Defendants to change this housing arrangement, which they did not do, is insufficient to show that Defendants disregarded an excessive risk to Plaintiff's health or safety. *See Farmer*, 511 U.S. at 837; *Sanders*, 2022 WL 16729580, at *3 (concluding that "[t]he facts alleged only suggest the mere possibility that the Eighth Amendment was violated, which is not sufficient to state a claim for relief," and explaining that "[f]or example, without knowing when the prisoners tested positive in relation to when the placements were made, it cannot be determined whether the defendants acted with a 'state of mind more blameworthy than negligence'").

13

In short, Plaintiff appears to ask the Court to fabricate plausibility to his claims from mere ambiguity. But ambiguity does not support a claim. The Court is sympathetic to the challenges that Plaintiff and other prisoners have faced while incarcerated during the COVID-19 pandemic. However, Plaintiff must plead enough factual content to permit the Court to draw a reasonable inference that Defendants violated the Eighth Amendment. *See Iqbal*, 556 U.S. at 679. Plaintiff has not done so here. Therefore, with the exception of Plaintiff's Eighth Amendment claim against Defendant Hoult regarding COVID-19-positive kitchen porters, all of Plaintiff's other Eighth Amendment claims against Defendants Huss, Viitala, Pelky, Hoult, and Tasson will be dismissed.

B.     **State Law Claims**

Plaintiff also claims that Defendants' actions violated the MDOC's COVID-19 policies and protocols. Claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Plaintiff's assertions that Defendants violated state law or the MDOC's policies fail to state a claim under § 1983.

Furthermore, in determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)).

With respect to Defendants Huss, Viitala, Pelky, and Tasson, because Plaintiff's federal claims against these Defendants will be dismissed, the Court will dismiss Plaintiff's state law

14

claims against these Defendants without prejudice. As to Defendant Hoult, because Plaintiff continues to have a pending federal claim against Defendant Hoult, the Court will exercise supplemental jurisdiction over his state law claim against Defendant Hoult.

### Conclusion

Having conducted the review required by the PLRA, the Court determines that Plaintiff's federal claims against Defendants Huss, Viitala, Pelky, and Tasson will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's state law claims against Defendants Huss, Viitala, Pelky, and Tasson will be dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over such claims. With the exception of Plaintiff's Eighth Amendment claim against Defendant Hoult regarding COVID-19-positive kitchen porters, all of Plaintiff's other Eighth Amendment claims against Defendant Hoult will be dismissed. The following claims against Defendant Hoult remain in the case: Plaintiff's Eighth Amendment claim regarding COVID-19-positive kitchen porters and his state law claim.

An order consistent with this opinion will be entered.

Dated:   May 22, 2023                           /s/ Paul L. Maloney
                                                Paul L. Maloney
                                                United States District Judge